KELLUM, Judge.
William Brownlee was convicted of one count of sodomy in the second degree, a violation of § 13A~6-64(a)(l), Ala.Code 1975, and one count of sexual abuse in the second degree, a violation of § 13A-6-67(a)(2), Ala.Code 1975. He was sentenced to 20 years’ imprisonment for the sodomy conviction and to 1 year’s imprisonment for the sexual-abuse conviction.
The evidence adduced at trial indicated the following. D.D.H., who was 16 years old at the time of trial, testified that she had been repeatedly sexually abused by both her parents throughout her life. When asked how long the abuse had been going on, D.D.H. responded: “There’s not a time where I. don’t remember.” (R. 256.) D.D.H. said that her parents would also allow other people to sexually abuse her, including William Brownlee, a friend of D.D.H.’s father. D.D.H. testified that on one occasion while she was living in Stockton with her parents, Brownlee came over with two of his relatives who were minors; her father and her two brothers were also at the house. D.D.H. said that her father sent the four other children to a bedroom *1027 and then he and Brownlee told her to follow them into her parents’ bedroom. According to D.D.H., Brownlee “took his clothes off and then took mine off, and Daddy made us do the 69. He made [Brownlee] get on top of me.” (R. 259.) D.D.H. stated that “69” was “where you give the guy a.blow job while he licks your vagina.” (R. 259.) Specifically, D.D.H. stated-that she was lying on her back on the bed, that Brownlee got on top of her, that her father “forced [Brownlee’s] penis into my mouth,” and that Brownlee then started “moving up and down” while he “[l]ick[ed] my vagina.” (R. 259-61.) D.D.H. said that Brownlee then got off of her, pulled her down to the foot of the bed, and “perform[ed] oral sex on” her again. (R. 263.) Specifically, D.D.H. testified that Brownlee “lick[ed] my vagina. He opened it with two fingers and licked me.” (R. 264.) During this time, D.D.H. said, her father was “sitting off over towards the side masturbating.”' (R. 263.) When asked how old she was at the time of the incident, D.D.H. testified that she could not remember. When then asked if she was over the age of 12 when thé incident occurred, D.D.H. answered “No, ma'am.” (R. 274.) However, she then stated that she was “[p]robably eleven or twelve.” (R. 274.) D.D.H. testified that she' was born on August 18,1998.
The State also elicited testimony from D.D.H. regarding other incidents of abuse by Brownlee. The State elected during trial to rely solely on the incidents described above to support the charges of second-degree sodomy and second-degree sexual abuse, and it offered the testimony regarding other incidents pursuant to Rule 404(b), Ala. R. Evid. D.D.H. testified that on another occasion at the Stockton house, Brownlee came over while she was alone with her father. D.D.H. said that her father held her down and “I was giving Daddy a blow job while [Brownlee] was performing oral sex on me.” (R. 266.) D.D.H. said that on another occasion, her uncle and Brownlee came over and her father videotaped them as her uncle and Brownlee took turns performing oral sex on her while, she performed oral sex on them. On yet another occasion, D.D.H. said, her father took her to Brownlee’s mobile home in Mobile. Brownlee .was on the bed under a blanket and was naked from the waist down. D.D.H. said that her father “took off my pants and shoes and underwear, and ... made me get on top of’ Brownlee. (R. 269.) According to D.D.H., Brownlee started kissing her, but then said “if she doesn’t want to do this, she doesn’t have to,” at which point D.D.H. got off Brownlee and went to the car. (R. 270.)
D.D.H. further testified that sometime in 2011, Brownlee, Brownlee’s wife, and Brownlee’s stepdaughter came to live with her and her. parents in Fairhope. D.D.H. said that she and her parents lived in Fairhope after they had lived in Stockton. While they were living in Fairhope, D.D.H. said, there was one occasion when Brown-lee came up behind her and put his hands around her stomach “and then he moved them up towards my boobs and started kissing my neck,” at which point she “nudged him away.” (R. 273.) On another occasion in Fairhope, D.D.H. said, Brownlee performed oral sex on her.
Pursuant to Rule 404(b), Ala. R. Evid., the State also presented testimony from T.H. and H.B. T.H., who was 19 years old at the time of trial, testified that when she was 12 years old she learned that D.D.H.’s father was also her biological father and she began a. relationship with him. When she was 12 or 13 years old, her father took her to the Red Roof Inn, a motel in Mobile, where she met Brownlee. Her father told her that Brownlee “was going to do what Dustin did.” (R. 336.) T.H. said *1028 that her father had previously taken her to have sex with a man named Dustin. T.H. told her father that she did not want to have sex with Brownlee, but her father told her that she “needed to.” (R. 337.) T.H. testified that she sat down on the bed and that Brownlee sat beside her. Brown-lee began kissing her and touching her body and then took off her clothes. Brownlee then “started performing oral sex” on her. (R. 339.) After a while, T.H. said, Brownlee removed his clothes and had sexual intercourse with her. T.H. said that her father watched as Brownlee had intercourse with her. After Brownlee was finished, T.H. said, she and her father left the motel.
H.B., who was 23 years old at the time of trial, testified that Brownlee was her stepfather. In 2003, when -she was 12 years' old, Brownlee sexually abused ■ her. H.B. testified that while she was trying to sleep on a mattress on the floor at her mother and Brownlee’s mobile home in Mobile, Brownlee “rolled- up against me, and he was feeling all over my body.” (R. 353.) According to H.B.S- Brownlee “was feeling all over my body, he had his hand down in my pants, he had his penis on my butt trying to actually have sex with me, and I told him to stop.”' (R, 353.) H.B. then got up and got on the sofa with her stepsister, at which point Brownlee left her alone. H.B. said- that she reported the abuse to her biological father and later to the authorities, but that her father subsequently told her that there was not enough evidence to prosecute Brownlee.
Dr. Jessica Kirk, a pediatrician at the University of South Alabama Children and Women’s Hospital who is board-certified in child-abuse pediatrics and who was deemed an expert by the trial court, testified that “less than one percent of the time would you have any physical trauma” from oral sex and with “any form of sexual abuse over 72 hours [after the abuse], it’s very difficult to see any signs of trauma if they were there, because that área is so incredibly quick healing ... that the injuries heal back to what looks normal in over ninety percent of cases.” (R. 314.) Dr. Kirk further testified that rape kits to collect samples from victims are generally only performed if the abuse occurred within 72 hours of being reported. Finally, Dr. Kirk stated that it is “extremely typical” for a child to not disclose everything that happened when first reporting abuse. (R. 315.)'
The State also presented evidence indicating that Brownlee was interviewed by law-enforcement officers on two occasions in 2012 regarding D.D.H. Donnie Payne, an investigator with the Baldwin County Sheriffs Office, testified that he and Eric Winberg, also an investigator with the Baldwin County Sheriffs Office, interviewed Brownlee on July 22, 2012. During that interview, Brownlee denied any wrongdoing. Clay Poche, with the Mobile Police Department, testified -that he interviewed Brownlee on August 31, 2012. Poche stated that he advised Brownlee , of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that Brownlee indicated that he understood those rights, and that Brownlee waived his rights.
In his August 2012 statement, introduced into evidence as State’s Exhibit 3, Brownlee stated that he was born in 1964 and was 48 years old at the time of the interview. Brownlee said that he had known D.D.H.’s father since Brownlee was seven years old; Brownlee initially denied having any sexual contact with D.D.H. However, after further questioning, he admitted that on one occasion, D.D.H.’s father had “grabbed [him] out of the bathroom and held [him] on the bed” and “made [D.D.H.] pull [his] pants down” and *1029 get on top of him. Brownlee said that D.D.H. also pulled- her pants down and that D.D.H. rubbed her genitals on his penis. Brownlee said that this incident occurred at D.D.H.’s house in Stockton, and when he was asked how many years ago it happened, ■ he- said “about three.” According to Brownlee, he suffered broken ribs as a result of D.D.H.’s father grabbing him and holding him down during that incident. Brownlee stated that he, D.D.H.’s father, D.D.H.’s grandfather, and D.D.H.’s uncle were all present at the time of the incident. Brownlee denied that anything else occurred during that incident. However, later in his statement, Brownlee admitted that during that incident, D.D.H. had gotten on top of him, had put her genitals on his face, and had moved back and forth “all over-[his] face.” Brownlee also said that D.D.H.’s father had made D.D.H. perform oral sex on Brownlee at the same time. When asked if D.D.H. was a teenager at the time of the incident or if she was younger, Brownlee said that D.D.H. was “developed.”
Brownlee denied that he had sexual contact with D.D.H. on any other occasion, although he admitted that D,D.H.’s father had offered D.D.H. to him on another occasion while D.D.H. and her family were living in Fairhope. Brownlee said, however, that he declined the offer because both his wife and stepdaughter were with him at the time. Brownlee claimed in • his statement that he was afraid of D.D.H.’s father because D.D.H.’s father’s entire family had raped him when he was younger. He also said that after the incident in Stockton with D.D.H., D.D,H.’s father told him that he would make sure that Brown-lee got into trouble if Brownlee said any-thipg about the incident...
Brownlee also initially denied in his statement ever meeting T.H. However, he later- admitted that D,D.H.’s father had called him one time and asked him to come to a motel to meet a girl.- When he arrived, at the motel,- Brownlee said, the girl was lying naked on the bed. Brownlee said that D.D.H.’s father told him that the girl was a family member from Mississippi who wanted to have sex and that the girl was 21 years old; Brownlee also said that he thought that the girl looked like she was at least 21 or 22 years old. D.D,H.’s father never told him that the girl was his daughter, Brownlee said. Brownlee admitted having sexual intercourse with the girl, but said that D.D.H.’s father did'not tell the girl what to do. According to Brownlee, the girl knew what she was doing; he said this was not the girl’s “first time around the block.”
After both sides rested and the trial court instructed the jury on the applicable principles of law, the jury convicted Brownlee of one count of second-degree sodomy and one count of .second-degree sexual abuse as charged in the indictment. This appeal followed.
I.
Brownlee first contends on appeal that the trial court erred in denying his request for discovery of a complete copy of D.D.H.’s journals that allegedly detailed her abuse at the hands of Brownlee and numerous other individuals. He also contends that the trial court erred in denying his request to cross-examine D.D.H. regarding a sexual-abuse allegation she had made against C.C. Brownlee argues that his defense at trial was that D.D.H. “had a propensity of - making false allegations due to her confusion-because of the sheer number of sexual predators that her own mother and father-had subjected her to over the course of many, many years” ■ and that D.D.H. “had a propensity of making false allegations when she was angry at someone.” ■ (Brownlee’s brief, pp. 31-32.) *1030 Brownlee asserts that his defense was that. D.D.H. either mistakenly identified him or accused him because she was mad after he had reprimanded her for making a derogatory remark about his grandchildren. Brownlee argues that D.D.H.’s journals contained allegations by D.D.H. against other individuals who had not yet been charged with any crime, which, he says, establishes that those allegations were false. He also argues that D.D.H. made the allegations against C.C. only after she had gotten into an argument with C.C.’s granddaughter and that C.C. and his granddaughter had denied the sexual-abuse allegations, making D.D.H.’s allegations against C.C., according to Brownlee, false. The trial court’s refusal to order production of a complete copy of the journals and to allow him to cross-examine D.D.H; about the allegations in the journals and about her allegations against C.C., Brownlee asserts, denied him his constitutional right to confront and cross-examine his accuser. We disagree.
Before trial, Brownlee filed a motion for production of a complete copy of D.D.H.’s journals as well as all information relating to “outstanding, or pending investigations, if any exist, that have yet to result in an arrest, as well as any investigations into alleged abuse that failed to warrant a disposition.” (C. Í03.) At a pretrial hearing on the motion, Brownlee argued that he was entitled to the journals so that he could challenge D.D.H.’s veracity on cross-examination. Brownlee argued that if any of the allegations D.D.H. had made in the journals had not yet resulted in prosecution, “that would go against her veracity or her truthfulness in this particular situation.” (R. 7.) In response, the State argued that D.D.H.’s journals were the work product of the State because the State had requested that D.D.H. create the journals in an effort to help her recall everything that had happened to her. The State also argued that the journals had already been provided to the trial court for an in camera inspection and that all exculpatory information had been provided to the defense. According to the State, Brownlee would be entitled to the journals only if D.D.H. testified during trial inconsistently with what she had written in the journals, at which point, the State said, it would be incumbent on it and/or the court to notify the defense of the inconsistent statement. According to the State, Brownlee’s request for- a complete copy of the journals before trial was nothing more than a fishing expedition. Finally, the State argued that the investigation into D.D.H.’s allegations was ongoing and that, to date, 15 people had been indicted. The State maintained that D.D.H. had no control over what prosecutions would be brought based on her allegations or when those prosecutions would begin and that “just because a case hasn’t been presented or somebody hasn’t been arrested on that does not mean that those statements are untrue.” (R. 11.) The State conceded that if D.D.H. had recanted any of her allegations, then Brownlee would be entitled to impeach her with her recantation. The trial court denied the motion for production.
Subsequently, two days before trial began, the State filed a motion in limine to prohibit Brownlee from mentioning or presenting evidence of allegations by D.D.H. against other people that had not yet resulted in prosecution. Following jury selection and ’ opening statements, the trial court held a hearing on the motion outside the presence of the jury. At the hearing, Brownlee called D.D.H. to testify to make an offer of proof. Brownlee questioned D.D.H. about allegations of abuse she had made against W.M. arid C.C. D.D.H. testified that' in one of her reports to the Department of Human Resources, she had alleged that J.M. arid her husband, W.M., *1031 had sexually abused her. D.D.H. stated that she had later recanted her allegation against W.M. because she had confused W.M. with someone else who looked -“very similar to” W.M. (R. 245.) D.D.H. also testified that she had informed her school counselor that C.C. had sexually abused her on numerous occasions and that he had also had sexual intercourse with his own granddaughter. D.D.H. testified that C.C.’s granddaughter was present each time C.C. abused D.D.H., but that the granddaughter would leave the room “once [C.C.] started doing whatever he was doing.” (R. 23ÍM0.) D.D.H. said that she was aware that both C.C. and his granddaughter had denied that C.C. had ever abused D.D.H. and that C.C.’s granddaughter had said that D.D.H. had made the allegations only because she and D.D.H. were mad at each other after a fight. However, D.D.H. denied that she had made the allegations against C.C. because she and C.C.’s granddaughter had gotten into a fight and were mad at each other. D.D.H. testified that her allegations against C.C. were true. ,D.D.H. also testified that she was present and “went along with it” when her brother used a derogatory term to describe Brownlee’s grandchildren in Brownlee’s presence. (R. 244.) However, she denied that Brownlee had gotten mad at her or scolded her for the derogatory remark; D.D.H. said that Brownlee simply asked her not to make the remark again.
After D.D.H.’s testimony, Brownlee argued that he should be allowed to cross-examine D.D.H. about her allegations of abuse against W.M. that she later recanted. He argued that D.D.H.’s recantation “goes directly to our defense in that we’re saying — And I said this in opening 'as well — that there’s so many instances, she’s not a hundred percent sure which people were which.” (R. 246.) Brownlee further argued that he looked very similar to a man named N.M. and that he wanted to pursue the defense that D.D.H. had mistakenly identified him just as she had W.M. Brownlee also argued that he should be allowed to cross-examine D.D.H. about her allegations against C.C. that both C.C. and C.C.’s granddaughter had denied. Brownlee argued that the allegations against C.C. came shortly after D.D.H. and C.C¡’s granddaughter had gotten into a fight and that this was similar to her allegations against Brownlee, which, he said, came shortly after Brownlee had reprimanded D.D.H. for making a derogatory remark about his grandchildren. The State argued, on the other hand, that prior bad acts cannot be used to establish untruthfulness and that Brownlee had failed to establish the falsity of D.D.H.’s allegations against C.C., which, the State said, was necessary before Brownlee would be entitled to question D.D.H. about those allegations. The trial court ruled that Brownlee could cross-examine D.D.H. about her allegations against W.M. and her later recantation of those allegations but that Brownlee could not cross-examine D.D.H. about her allegations against C.C.
Initially, we point out that pretrial discovery of statements by a prosecution witness is generally not authorized. See Rule 16.1(e), Ala. R.Crim. P. See also Ex parte Key, 890 So.2d 1056, 1064 (Ala.2003) (“[A]n inculpatory statement made by a prosecution witness is not discoverable under Rule 16, Ala. R.Crim. P.”). However,
“The rule of discovery is different where a prosecution witness has testified on direct examination in the trial of the .case.
“In such cases, the defendant, upon laying a proper predicate, is entitled to have the Court, at least, conduct an in camera inspection.... The trial court *1032 could determine initially (1) whether the statement made by the witness before trial differed in any respects from statements made to the jury during trial, and (2) whether the statement requested was of such a nature that without it the defendant’s trial would be fundamentally unfair.”
Ex parte Pate, 415 So.2d 1140, 1144 (Ala.1981) (citations omitted). “A defendant lays a proper predicate for an in camera inspection of a witness’s statement when the defendant provides evidence that the witness made a statement and that the witness has signed the statement or that the statement can otherwise be authenticated.” Ex parte Key, 890 So.2d at 1064.
In Killough v. State, 438 So.2d 311 (Ala.Crim.App.1982), rev’d on other grounds, 438 So.2d 333 (Ala.1983), this Court addressed an issue similar to Brownlee’s issue relating to D.D.H.’s journals. After being indicted for the theft of a portable building from a hurricane disaster housing office in Mobile, Lee Killough moved for pretrial discovery of a diary kept by a prosecution witness regarding the operations of the housing office. In upholding the trial court’s denial of Killough’s discovery request, this Court explained:
“The Supreme .Court of this state, in the recently decided case Ex parte Pate, 415 So.2d 1140 (Ala.1981), reviewed the question ‘whether or when the defendant in a criminal case is entitled to inspection of a statement of a prosecution wit-' ness for the purpose of cross examination or impeaching the witness.’ This case confirmed the ‘general rule that an accused is not entitled to discover statements of government witnesses before trial.’ Thigpen v. State, 355 So.2d 392 (Ala.Cr.App.), affirmed, 355 So.2d 400 (Ala.1977); Beard v. State, 337 So.2d 1372 (Ala.Cr.App.1976). The Court specifically noted that ‘(t)he rule of discovery is different where a prosecution witness has testified on direct examination in the trial of the case from the instance where the statement is sought before the witness testifies.’
“Time and time again the courts of this state have held that an accused is not entitled to the inspection or discovery of evidence in the possession of the prosecution to conduct a mere fishing expedition in preparation of his defense. Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968); Sanders v. State, 218 Ala. 453, 179 So.2d 35 (1965); Cooks v. State, 50 Ala.App. 49, 276 So.2d 634, cert. denied, 290 Ala. 363, 276 So.2d 640 (1973). This principle comports with the general proposition that a defendant is not, as a matter of right, entitled to inspection or disclosure of evidence in the possession of the prosecution prior to trial. Bellew v. State, 238 Miss. 734, 106 So.2d 146 (1958), cert. denied, 360 U.S. 473, 79 S.Ct. 1430, 3 L.Ed.2d 1531 (1959). Also see Annot., Discovery-Prosecution’s Evidence, 7 A.L.R.3d 8, 22 (1966); C. Gamble, McElroy’s Alabama Evidence, Section 290.05 (3rd ed.1977). ,
“We hold, as did the trial judge, that when a defendant’s avowed purpose for inspecting a statement or document prepared by a potential prosecution witness .is to cross examine or impeach that witness’s testimony should he actually testify, then any such request for production prior to trial is premature. Pate, supra; Millican v. State, 423 So.2d 268 (Ala.Cr.App.1982).”
438 So.2d at 316.
Similarly, in this case, Brownlee’s pretrial request, for discovery of D.D.H.’s journals was premature. Brownlee did hot reassert his request for discovery of the journals after D.D.H. had testified, nor did he. request an in camera inspection to determine if the journals were inconsistent *1033 with D.D.H.’s testimony.[1] Therefore, we find no error on the part of the trial court in denying Brownlee’s pretrial request for discovery of D.D.H,’s journals.
That being said, we recognize that the purpose of Brownlee’s request for discovery of the journals was. not so that he could impeach D.D.H, with prior inconsistent statements. Rather, Brownlee wanted the journals so that he could impugn D.D.H.’s veracity by establishing that some of or all the allegations she had made in the journals, against people other than Brownlee, had not yet resulted in criminal prosecutions. The lack of prosecution, Brownlee asserted, established the falsity of the allegations. By the same token, Brownlee requested that he be permitted to cross-examine D.D.H. about the allegations she had made against C.C., allegations Brownlee asserted were false because they had been denied by both C.C. and C.C.’s granddaughter. However, the type of cross-examination requested by Brownlee is improper.
Alabama’s rape-shield rule, Rule 412, Ala. R.Crim. P., generally prohibits the admission of evidence of a victim’s, past sexual behavior. Nonetheless, it .is well settled that evidence that a sexual-assault victim has made false allegations of sexual abuse against persons other than the defendant is admissible to show a pattern by the victim of making false allegations. See Ex parte Loyd, 580 So.2d 1374, 1375-76 (Ala.1991). However, only “when it has been shown that the,; witness’s prior charges were false [is] the fact of then-having been made ... admissible.” Phillips v. State, 545 So.2d 221, 223 (Ala.Crim.App.1989). “[DJemonstrated falsity is the sine qua non of admissibility of this species of evidence.” Peeples v. State, 681 So.2d 236, 238 (Ala.1995). In this case, Brownlee failed to establish that the allegations D.D.H. had made in her journals or the allegations D.D.H. . had made against C:C. were, in fact, false.
Contrary to Brownlee’s belief, the fact that authorities had not yet, at the time of Brownlee’s trial, prosecuted one or more people D.D.H. had accused in' her journals of abusing her does not establish that D.D.H.’s allegations against those people were, in fact, false. “[T]he failure to investigate or prosecute does not establish the1 falsity of the statements.” State v. West, 95 Haw. 452, 461, 24 P.3d 648, 657 (2001). “That charges were never, filed ... does not mean the [allegation] was false, for there are many reasons rape charges might not be filed, including, e.g., that the prosecutor declined to pursue the charges.” State v. Raines, 118 S.W.3d 205, 214 (Mo.Ct.App.2003). Cf. Lopez v. State, 18 S.W.3d 220, 225-26 (Tex.Crim.App.2000) (holding that the fact that the Department of Human Resources “closed” the case and “ruled out” abuse does not necessarily demonstrate that the allegations of abuse were false; “[t]his could simply indicate a lack of evidence to prove the allegation at that time, or an administrative decision that, despite the allegation’s validity, the parties would best be served by closing the case”); Phillips, 545 So.2d at 223-24 (“The defendant’s offer of proof that two prior, rape charges [against other people] had been the subject of .nolle prosequi ... did not demonstrate the falsity of those charges.”); State v. Schwartz-Miller, 107 Idaho 89, 92, 685 P.2d 830, 833 (1984) (“A not guilty verdict, standing by itself, can never be taken,to establish that *1034 the charges brought were based on false accusations, since one may not be convicted of a crime unless a jury finds beyond a reasonable doubt the guilt of the defendant.”); and People v. Alexander, 116 Ill.App.3d 855, 861, 72 Ill.Dec. 338, 342, 452 N.E.2d 591, 595 (1983) (“In the present case, the prior accusations of rape were not proved false. One of the prior rape accusations terminated in a finding of no probable cause; the other culminated in two hung juries. The intrinsic veracity of the complainant’s accusations should not be confused with the inability of the State to meet its burden of proof for a criminal conviction.”).
Likewise, the fact that C.C. and his granddaughter had denied that C.C. had abused D.D.H. does not establish that D.D.H.’s allegations against C.C. were false. “[A] mere denial does not establish falsity.” State v. Anderson, 211 Mont. 272, 286, 686 P.2d 193, 200 (1984). A denial “is inherently self-serving and does not, by itself, establish falsity.” Richardson v. Commonwealth, 42 Va.App. 236, 241, 590 S.E.2d 618, 621 (2004). See also Commonwealth v. Hicks, 23 Mass.App.Ct. 487, 491, 503 N.E.2d 969, 973 (1987) (noting that a denial by the alleged perpetrator “to show falsity of other accusations is generally rejected”). Moreover, D.D.H. testified at the hearing that her allegations against C.C. were true.
Because Brownlee’s pretrial request for production of D.D.H.’s journals was premature and because Brownlee failed to establish that any of D.D.H.’s allegations in the journals or D.D.H.’s allegations against C.C. were false, the trial court properly denied Brownlee’s request for production of D.D.H.’s journals and properly refused to allow Brownlee to cross-examine D.D.H.. about her allegations against C.C.
II.
Brownlee also contends that the trial court erred in allowing the State to present evidence of collateral acts of sexual abuse by Brownlee against D.D.H. and against T.H. and H.B. pursuant to Rule 404(b), Ala. R. Evid. Brownlee appears to concede on appeal that the evidence was admissible under the motive exception in Rule 404(b), but he argues that the evidence should nevertheless have been excluded because, he says, he had never been indicted or convicted of the collateral acts and because, he says, the evidence was more prejudicial than probative.
Before trial, the State filed notice of its intent to submit evidence of collateral acts of sexual abuse against D.D.H., T.H., and H.B. to prove Brownlee’s motive, to rebut any defense of duress, and to show absence of mistake or accident. Brownlee filed a motion to exclude the Rule 404(b) evidence. At a pretrial hearing on the matter, Brownlee conceded that generally collateral acts of sexual abuse are admissible to establish motive, but he argued that “[t]he thing about this case that separates it [from other cases holding such evidence to be admissible] is, it wasn’t multiple victims, it wasn’t lots of different times. We’re talking about three contacts that we’re here for, okay.” (R. 38.) Brownlee also argued that evidence of the collateral acts was inadmissible to rebut a defense of duress because he was not asserting duress as a defense and that it was inadmissible to show absence of mistake or accident because he was not asserting that he had acted by mistake or accident. Brown-lee further argued that evidence of the collateral acts was inadmissible because he was never charged for the acts and because, he said, the acts against H.B. were too remote, having happened some 12 years before Brownlee’s trial. The State argued that the evidence of collateral acts *1035 was admissible to show Brownlee’s motive, i.e., “his passion or propensity for abnormal sexual relations.” (R. 46.) The State also argued that evidence of collateral acts was admissible to rebut the assertion by Brownlee in his statement to police that he was afraid of D.D.H.’s father. The trial court ruled the evidence was admissible to show motive.
During trial, after D.D.H. had testified about the incident in Stockton on which the State elected to rely to support the charges against Brownlee, the State notified the trial court that it was about to question D.D.H. about collateral acts of sexual abuse by Brownlee. . Before questioning proceeded, the trial court gave the jury a limiting instruction that the testimony regarding collateral acts, could be used only to show Brownlee’s motive. The trial court repeated its limiting instruction to the jury during.T.H.’s testimony and during H.B.’s testimony.. The trial court repeated the limiting instruction again during its final oral charge to the jury. Brownlee objected to D.D.H.’s testimony regarding collateral acts of abuse, to T.H.’s testimony, and to H.B.’s testimony; the trial court overruled all of Brownlee’s objections.
“ ‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of eollateral-bad-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2005).”
Windsor v. State, 110 So.3d 876, 880 (Ala.Crim.App.2012).
In Proctor v. City of Prattville, 830 So.2d 38 (Ala.Crim.App.2001), this Court explained:
“ “Rule 404(b), Ala. R. Evid., provides, in pertinent part:
“‘Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent; preparation, plan, knowledge, identity, or '■ absence of mistake or accident....’
“A trial judge should exclude evidence falling within one of the exceptions listed in [Rjule' 404(b) only if the probative value of that evidence is substantially outweighed by the danger of unfair prejudice. See Ex parte Register, 680 So.2d 225 (Ala.1994).
“Under the general exclusionary rule in Rule 404(b), a prior act of sexual abuse would be inadmissible. However, in this' case, the alleged prior bad act was offered to prove motive.
““‘Motive is defined as ‘an inducement, or that which leads or tempts the mind to do or commit the crime charged.’ Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as ‘that state of mind which works to “supply the reason that nudges the will and prods the mind to indulge the criminal intent.” ’ [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).] :
“ ‘ “Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). *1036 Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Crim.App.1986). ‘“It is permissible in every criminal case to show that there was an influence, an inducement, .operating on the accused, which may have led or tempted him to commit the offense.” McAdory v. State, 62 Ala. 154 [ (1878) ].’ Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).” ’
“Hatcher v. State, 646 So.2d 676, 679 (Ala.1994), quoting Bowden v. State, 538 So.2d 1226, 1237 (Ala.1988).
“In determining whether evidence of a collateral act of sexual abuse is admissible to prove motive, the trial court must consider the following factors: ‘ “(1) the offense(s) charged; (2) the circumstances surrounding the offense(s) charged and the collateral offense(s); (3) the other collateral evidence offered at trial; and (4) the other purpose(s) for which it is. offered.” ’ Campbell v. State, 718 So.2d 123, 130 (Ala.Crim.App.1997), quoting Bowden, 538 So.2d [at] 1237.”
830 So.2d at 41-42. See also Ex parte Register, 680 So.2d 225, 228 (Ala.1994) (testimony regarding collateral acts of sexual abuse was admissible to establish motive, i.e., it “had some tendency to show that [the defendant] had a passion or propensity for unusual and abnormal sexual relations”); Garner v, State, 977 So.2d 533, 537 (Ala.Crim.App.2007) (testimony regarding collateral acts of sexual abuse was admissible to show the defendant’s motive, i.e„ his “unnatural sexual desire for young girls”); Bedsole v. State, 974 So.2d 1034, 1039 (Ala.Crim.App.2006) (testimony regarding collateral acts of sexual.abuse was admissible to prove that the defendant was “ ‘motivated by an unnatural sexual desire for young girls’ ” (quoting Estes v. State, 776 So.2d 206, 211 (Ala.Crim.App.1999)).
In this case, the charged offenses and' the collateral acts all involved young vulnerable girls of approximately the same age and were similar, albeit not identical, in nature. See, e.g., Allen v. State, 624 So.2d 650, 653 (Ala.Crim.App.1993) (“It is not significant that the sexual misconduct was not precisely the same with [all] of the girls.”). Although the collateral acts against H.B. occurred some 12 years before the charged crimes, any remoteness “affected the weight and probative value the jury placed on [H.B.’s testimony], not its admissibility.” Bedsole, 974 So.2d at 1040. Moreover, contrary to Brownlee’s belief, the fact that he had not been charged or convicted of the collateral acts does not preclude admission. By its plain language, Rule 404(b) applies to “other crimes, wrongs, or acts,” not just to prior crimes that have’ resulted in conviction. “Without regard to the presence of a conviction, the prosecution may prove Rule 404(b) conduct through proof of underlying facts, such as the accused’s possession of stolen property, through testimony of a witness who was an observer of the conduct or through testimony of a witness who was a victim of the conduct.” C. Gamble and R. Goodwin, McElray’s Alabama Evidence § 69.02(2) (6th ed.2009) (footnotes omitted),
“When it is decided that prior crimes or acts of the accused ¿re admissible to prove a proper purpose asserted under Rule 404(b), the question naturally arises as to what degree of proof is required to show such a.prior criminal act. If the accused was convicted for the former misconduct then,-of course, the record of the conviction will generally suffice. However, if there - was no conviction for the other crime or misconduct then it has been stated that the court should proceed slowly and require more than mere rumors and suspicions. Some courts require that extrinsic acts be proven beyond a reasonable doubt while others require clear and convine- *1037 ing proof. All of these tests, however, appear more strict than that applied in the courts of Alabama. The Alabama requirement is more like that now affirmed by the United States Supreme Court under which the judge must simply decide whether the evidence is suffi-dent for the jury to decide that the collateral act did occur and that the accused committed it.”
Gamble, § 69.02(4) (emphasis added; footnotes omitted). Of. Scott v.. State, 163 So.3d 389, 429-31 (Ala.Crim.App.2012) (noting that evidence of collateral acts is admissible as long as there is .some evidence presented connecting the defendant to the collateral acts). Here, the State presented the testimony of the victims of the collateral acts; this testimony was sufficient for. the jury to conclude that the collateral acts did occur and that Brownlee committed the acts.
Under these circumstances, evidence of Brownlee’s collateral acts of sexual abuse against D.D.H., T.H., and H.B. was clearly admissible to show Brownlee’s motive, i.e., his unnatural sexual desire for young girls. Additionally, after thoroughly reviewing the record, we conclude that the probative value of the evidence outweighed any . prejudicial effect, especially in light of the fact that Brownlee’s defense was that D.D.H. had misidentified him and/or had falsely accused him and that someone else had committed the charged crimes. We ¡also .point out that the trial court properly and repeatedly instructed the jury as to the limited1 purpose for which it could consider the evidence of the collateral acts. “Jurors are presumed to follow the trial court’s instructions.” Lewis v. State, 24 So.3d 480, 508 (Ala.Crim.App.2006), aff'd, 24 So.3d 540 (Ala.2009). Therefore, the trial court did not err in allowing the State to present evidence of collateral acts of sexual abuse by Brown-lee.
III.
Next, Brownlee contends that the trial court erred in allowing Dr. Jessica Kirk to testify regarding the likelihood of seeing physical trauma in child victims who had been sexually abused. He argues that there was no dispute that D.D.H. had been sexually abused by numerous people and that she had no physiological damage from the abuse and that, therefore, Dr. Kirk’s testimony was irrelevant and inadmissible under Rule 702(a), Ala. R. Evid. He also argues that Dr. Kirk’s testimony was prejudicial and could not be harmless error because, he says, it “did nothing, but conjure up gross images for the jury” regarding child victims of sexual abuse that served to inflame the jury. (Brownlee’s brief, p. 46.) ,
Before trial, the State provided notice of its intent to offer the'testimony of Dr. Kirk pursuant to Rule 702 to “aid the jury in [its] understanding of Child Sexual Abuse Victims and their biological and physiological responses as well as their demeanor and behavior during and after abuse.” (C. 129.) At a hearing outside the presence of the jury just before the trial began, Brownlee objected to Dr. Kirk’s testifying on the ground that her testimony would be irrelevant to any issue in the case because it was undisputed that D.D.H. had been repeatedly sexually abused by many different people. The trial court overruled Brownlee’s objection.
Rule 702(a), Ala. R. Evid., provides that, “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.” *1038 This Court has “recognized that the average juror is not likely to be conversant with the physiological and psychological symptoms of sexual abuse.” Inmon v. State, 585 So.2d 261, 267 (Ala.Crim.App.1991).
Dr. Kirk’s testimony satisfies the requirements in Rule 702(a). Dr. Kirk was deemed an expert in child-abuse pediatrics, and her testimony regarding the typical lack of physical trauma to children as a result of sexual abuse and the inability of medical professionals to identify any physical trduma after the trauma has healed, assisted the jury in understanding the evidence, or lack thereof, presented in this case. Specifically, Dr. Kirk’s testimony assisted the jury in understanding the lack of any physical signs of sexual abuse on D.D.H. despite her testimony that she had been repeatedly sexually abused her entire life. Moreover, Dr. Kirk’s testimony was general in nature; she presented no testimony regarding D.D.H. specifically and, in fact, stated that she had never examined D.D.H.. Under the circumstances in this case, we find no error on the part of the trial court in allowing Dr. Kirk to testify.
IV.
Finally, Brownlee contends that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State failed to present sufficient evidence to sustain his convictions. Specifically, Brownlee argues that the State failed to prove that D.D.H. was between the ages of 12 and 16 years at the time of the incident. He also argues that the State failed to prove that he was over the age of 16 years (with respect to the sodomy charge) and over the age of 19 years (with respect to the sexual-abuse charge).
“‘“In determining the sufficiency of the evidence to sustain á conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.” ’ Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). ‘ “The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder 'of fact could have found the defendant guilty beyond a reasonable doubt.”’ Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). ‘“When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court’s decision.”’ Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). ‘The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040,1042 (Ala.1978).”
Gavin v. State,. 891 So.2d 907, 974 (Ala.Crim.App.2003).
In this case, the State presented sufficient evidence from which the jury could have reasonably concluded that D.D.H. was at least 12 years old at the time of the crimes. As noted above, D.D.H. initially stated that she could not remember how old she was when the incident in Stockton that formed the basis of the charges occurred. When asked if she was over 12 years old at the time, D.D.H. first said no, but then stated she was either 11 or 12 *1039 years old at the time of the incident. Moreover, in his statement to police, when asked if D.D.H. was a teenager at the time of the crimes or was younger, Brownlee stated that D.D.H. was “developed.” From this evidence, the jury could have concluded, by fair inference, that D.D.H. was over 12 but less than 16 years old at the time of the crimes.
As for Brownlee’s argument that the State failed to prove that he was over 16 years of age and over 19 years of age, that argument was not properly preserved for review. Although Brownlee moved for a judgment of acquittal at the close of the State’s case, the only argument he made was that the State had failed to prove D.D.H.’s age. He never argued that the State had failed to prove his age. “The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.” Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). “A defendant is bound by the grounds of objection stated at trial and may not expand those grounds on appeal.” Griffin v. State, 591 So.2d 547, 550 (Ala.Crim.App.1991). Moreover, even if this issue had been preserved for review, it is meritless. In his statement to police in August 2012, which the State introduced into evidence, Brownlee stated that he was born in 1964. Clearly then, Brownlee was over the age of 16 and 19 years at the time of the crimes.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
WINDOM, P.J., and WELCH and BURKE, JJ., concur. JOINER, J., concurs in the result, with opinion.

. As noted above, the prosecutor pointed out at the pretrial hearing on this matter that D.D.H.'s journals had already been turned over to the trial court for an in camera inspection and that all exculpatory information had been provided to the defense. At no point did "Brownlee contest the accuracy of the prosecutor’s statement in this regard.